317-229 Suzette Mook v. Rachel Travistad as Executives of the Estate of Jeremy Travistad, Appellants by Alan Smetansky v. Robin Johnson and Jamie Johnson, Affiliates by Robert Regas Mr. Smetansky Thank you, Your Honor. May it please the court, Mr. Regas, as this court knows, the issue in this case is the granting of a remittiture, reducing the jury's verdict for punitive damages. When a trial judge hears a motion for remittiture, the trial judge's duty is to review the record for evidence that supports the amount of punitive damages granted. And that shows that the punitive damages award is not the result of passion, partiality, or corruption. In this case, the trial judge did not do that, and instead, the trial judge re-weighed the evidence as if it were a bench trial. Now, that is not just my characterization. In a lot of these cases, on remittiture, the trial judge simply reduces the punitive damages and doesn't give a clear recitation of the basis for that reduction. Where the jury went wrong, where the verdict is especially and clearly excessive. In this case, however, the judge does give us the benefit of his thoughts in great detail. And what those thoughts are, are clearly a weighing of the evidence as if it were a bench trial. Now, the judge starts out in his recitation by saying, In considering this motion, the court has carefully considered the facts of this case, which is a private matter between family members. Well, it's forgery. That's what it is. It's violation of the criminal law. It's theft. I do not understand the statement that it is a private matter between family members. There are many heinous crimes that are private matters between family members. He goes on to say that, this is in the very first paragraph, There are many factual aspects of this case that would support the defendant's position that to award punitive damages is improper. Now, this is after six years of litigation and a trial and a granting of, without objection, jury instructions that tell the jurors that they may award punitive damages in this case. Now, the judge who presided over this case is starting out his decision on remitted her, saying he thinks there's facts in this case that show there shouldn't be any award of punitive damages and that it's improper. So, he's not looking for facts that support the jury's verdict. He's looking for facts, he's made his determination that maybe there shouldn't even be punitive damages. What he reduced the verdict to is certainly not like punitive damages. It's a fraction of what the jury found were the actual damages. A fraction. In my study of these issues, I did not come across any fractions of actual damages being awarded as punitive damages. Then he goes on to say there is circumstantial evidence that the signature on certain documents, because there were surrender forms that were forged, there was the check which had forged signatures on them, that the circumstantial evidence that the signature was put there by the mother of Robin Johnson. Now, you won't find that fact recited in my recitation of the facts. You will not find that fact recited in the appellee's brief, Mr. Regas' brief, because it never occurred in the testimony. It did occur in some depositions, hearing on motion for summary judgment, but it didn't happen at the trial. The judge is remembering things that happened outside of the trial. He's referring to things outside of the trial and calling them facts. The judge goes on to say we are taught as children to honor our parents and to be patient with them when they get older. Robin R. Johnson may have been simply honoring her mother's wishes in taking the action that she did. Again, there was no testimony at trial about that. The only testimony at trial relating to the mother's wishes was a statement by Robin Johnson to Jeremy Trammelstead, who is now deceased and his executor is now in his place, that she told him, sign this. It was on the original surrender form. Sign this. Grandma wants you to sign it. There was no evidence to establish that Robin Johnson was committing forgery at the request of her mother. Again, these were things that might have been argued in the pretrial motions, but it was not part of the trial. What the judge is doing in this case is taking advantage of all the inadmissible evidence and making a decision over the jury based on not only the judge's prejudice in the case, but also on all of the things that he heard outside of the trial. I don't know how to grade this decision through any language other than it's just wrong. He wasn't doing what he was supposed to do. The judge goes on to say there was that a conviction for forgery in Illinois carries a sentence and may require restitution, a jail sentence and may require restitution and possible maximum fine of $25,000. What is he talking about? He's talking about criminal law. He goes on to say that Plaintiff Suzette Mook testified she presented the case to the state's attorney and no criminal charges were ever brought against the defendants. This specific point was a matter of heated debate between me and the trial judge because the trial judge said he was going to let that in, that the prosecuting authorities had refused this matter. And he was going to let Mr. Regas question Suzette Mook about that. And really over lunch hour and some heated words between myself and the judge, I thought he was still going to do it, but he surprised me and he didn't. He allowed my objection. He didn't let the evidence in, but it came back in anyway. He reduced the burning and based it in part on that, which was totally improper. That's why it didn't come before the jury. It was improper to consider, but now the judge is reciting it in his decision. I think if you look at these things, you can see in the judge's pronouncements from the bench that the granting of the remitter is totally improper. And I'm asking that this court reverse that decision and enter judgment on the jury's verdict as given. Thank you. Mr. Regas?  May it please the court. Mr. Spetansky, my name is Robert Regas, and I represent the appellees Robin and Jamie Johnson in this matter. The issue before this court is whether the order of the trial court permitting the punitive damages was an abuse of discretion. Section 2-1207 of the Code of Civil Procedure provides that a trial court may, in its discretion, with respect to punitive damage, determine whether a jury award of punitive damages is excessive, and if so, enter a remitter. Because punitive damages are penal in nature, they are not favored in the law, and the courts must take cause to see that the punitive damages are not improperly or unwisely awarded. There's two types of damages present in this case. There's compensatory damages and punitive damages. Both serve different purposes. Compensatory damages are to, in essence, make the plaintiff whole. Punitive damages are to punish. The court, what Mr. Spetansky is not talking about, is how the court arrived at its decision. The court properly looked to the, in essence, the guideposts for determining and weighing whether or not punitive damages are appropriate. Specifically, how reprehensible was the defendant's conduct? Within that, there's about five other factors. What actual and potential harm did defendant's conduct cause to the plaintiff in this case? And what amount of money is necessary to punish the defendant and to discourage the defendant and others to do such things? Now, when we look at reprehensibility, which appears to be probably the most important factor in determining this, the court looked to whether the harm caused was of a physical nature as opposed to an economic nature. In this matter, this was solely an economic harm. There was no physical harm done to the plaintiffs. The court was correct in that. With regards to whether the tortious conduct, in essence, caused an indifference to or a reckless disregard to the health or safety of others, the court correctly weighed that. That one is not present. Whether the target of the conduct had financial vulnerability. When you look to the situations that the plaintiff and the defendants were in at that time, this is not a defendant who is an insurance company who has billions of dollars and, in essence, is exploiting others. These are two people with relatively the same means. When you look to whether the conduct involved repeated actions or was an isolated incident, the conduct, I believe the court weighed that correctly. The conduct was of a very short nature. It lasted approximately about a month. This is not a situation where it lasted over the course of years. And whether the harm was the result of an intentional malice, trickery, deceit, or mere accident, I believe the court was correct when it determined that when we are children, we are taught to listen to our parents. Not saying that that excuses anyone's behavior by any means. That does not excuse anyone's behavior. Was there testimony that this was done at the direction of a parent? From my recollection, I believe that there was at some point in the trial that it came out that Robin Johnson testified that she was doing this under the direction of her mother. With regards to Jeremy Travistad, from my recollection. Now, I believe the court was correct in its determination to reduce the punishment. I'm sorry, Judge, I don't want to interrupt you. No, go ahead. I was just thinking that the Barker boys robbed banks in the direction of their mother. And they didn't make it any less reprehensible. No, I understand that, Judge. But I believe when a situation of robbing a bank, that is like a different than this type of situation. Robbing a bank is a situation that could definitely cause someone to be killed, to be seriously injured. As opposed to this situation where you have, and I believe it's important to look at why this insurance policy had to be cashed in. There were three options that the seven co-owners had. The seven co-owners could either pay the premium themselves, which would be roughly $20,000 apiece, because the yearly premium was $140,000. Or they could borrow against the cash value, or they had to surrender it and take the cash value. It was one of those three options. But it required all seven. That is correct, Judge. Yes, Justice, sorry. Now, when looking at the evidence, it appears that the first two were not feasible. That the parties did not have the abilities to pay the premiums. Not all of the seven parties did not have the ability to pay the premiums. And then with regards to borrowing against the cash value, I believe that the jury believed our position that that policy would have become void because it would have borrowed more than half of it against the cash value. Because when you look at the jury's verdict, the jury's verdict, the testimony was that Suzette Mook received roughly $45,000 from my client and then another $45,000 from her mother. The one-seventh share of the cash surrender value was about $612,000, roughly $90,000 per co-owner. They awarded her, in essence, to make it to that approximate $90,000. So I believe the jury, and with regards to Jeremy Travelstead, he testified through his deposition that he received $25,000 initially and the jury came back and awarded $65,000 in actual damages. So I believe the jury believed the evidence that would support that. They believe that the only option at that time was to surrender the policy. Okay. Let's accept that for the sake of analysis, but once the policy was surrendered, did everybody get their equal share? No, the evidence that came out during the trial was no, that once the policy was surrendered, that not everyone received their equal share. That is correct, Judge. Justice, I'm sorry. We're judges, that's all right. But I believe that the—I'm sorry, I lost my train of thought here. Excuse me. It's all right. I do believe the other—when looking at and assessing the punitive award, when the plaintiff argued in his closing for what they believed the damages were, I believe the plaintiff asked for $434,000 plus $868,000 in punitive damages for each of the plaintiffs. That is a punitive award that is twice what they believed or argued for what the actual damages were. And the jury, when the jury came back, they deviated from even what the plaintiff requested. Based on different numbers, though. Based on that $434,000 number. Based on the punitive damages that counsel was requesting would be double the $434,000, which would be the value to the beneficiaries for the $3.5 million, if I'm not mistaken. That would have been the full amount, correct? Yes, I'm sorry, I had to do the math in my head. Well, I can't do the math right now, so I'm just referring to the notes here. Yes. So when you say that the jury was—reduced it more than— your point is you haven't argued the right base number. Well, yes. They were requesting $434,000 plus $868,000 in punitives twice the amount of the— So if we apply that to the award that the jury gave Ms. Mook, which was $22,000, then punitives based on what counsel was requesting would have been 44, double. The judge reduced it even below that. Yes. Yes, I do believe that is correct. Because when you look at the guidepost, this is not a situation that warrants a high award of punitive damages. There is no physical harm done to the individual. When you look at some of the cases that the plaintiff cited before the court, I believe one of them being a Howe v. Mooningham in 1986 decision, in that case it was a bench trial where the defendant, in essence, beat the plaintiff with a shovel, hospitalized the plaintiff for approximately, I believe it was four months, and the trial court awarded actual damages of $30,000 and punitive equal to the actual damages in another $30,000. In this case, there is no physical harm done. So what the court— So, and then what happened on appeal? I believe it was affirmed, if I'm correct. So, because you can't have additive. So, in other words, the fact that that prior fact only awarded an amount equal to, in that case, does it really have any bearing on any other punitive cases? They affirm that. Courts can remit awards. They can't do additive. Yes, of course not. And so I'm just not sure that the shovel beating case has much relevance either way. Was I missing something? Since you're really good at math in your head, do you have any theory about why the jury picked $127,245.72? It's such an odd number. They had to do some sort of calculation to arrive at that for punitives. Do you have a theory on what they did? I mean— And your answer can be no. I mean, not exactly, Judge. And that's the other thing that makes it difficult about this punitive award is that you don't have any way of assessing how they determined to get right at that number. It doesn't appear to me that they picked a number out of the sky, just because of the nature of the award. You can continue. I believe I made my argument the best that I can. If there's no further questions at this time, I want to thank the Court and have a great day. Thank you, Mr. Regan. Mr. Smetansky, is there a rebuttal? Judge, I don't believe I have any further argument in this matter. If there are any questions, I'd be happy to answer them. No, sir? No, sorry. Okay, well, thank you both for your arguments here this morning. We'll take this matter under advisement, and this decision will be issued.